## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

|  |  |  |
|---|---|---|
| JOHN DOE,<br>c/o Friedman Nemecek Long & Grant,<br>LLC, 1360 E. 9th Street, Suite 650,<br>Cleveland, Ohio 44114 | : : : : | CIVIL NO. _____ |
| Plaintiff, | : : : | **JURY TRIAL DEMANDED** |
| v. | : : | |
| OHIO UNIVERSITY<br>1 Ohio University,<br>Athens, Ohio 45701 | : : : : : | |
| and | : : | |
| MOLLY BUKKY, Individually and in her<br>official capacity as Training Coordinator<br>and Civil Rights Investigator<br>1 Ohio University,<br>Athens, Ohio 45701 | : : : : : : | |
| and | : : | |
| KRISTINE HAYES, Individually and in<br>her official capacity as Civil Rights<br>Investigator<br>c/o Ohio University<br>1 Ohio University,<br>Athens, Ohio 45701 | : : : : : : : | |
| and | : : | |
| KERRI GRIFFIN, Individually and in her<br>official capacity as Director of Civil Rights<br>Compliant and Title IX Coordinator<br>1 Ohio University,<br>Athens, Ohio 45701 | : : : : : : | |
| and | : : : | |

G. ANTONIO ANAYA, Individually and  :
in his official capacity as Civil Rights  :
Investigator  :
c/o Ohio University  :
1 Ohio University,  :
Athens, Ohio 45701  :
 :
and  :
 :
JOHN ROES 1-5  :
1 Ohio University,  :
Athens, Ohio 45701  :
 :
          Defendants.  :

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**
**(Jury Trial Demanded)**

NOW COMES Plaintiff, John Doe [1], by and through undersigned counsel, Eric F. Long and Tyler J. Walchanowicz, of Friedman Nemecek Long & Grant, L.L.C., and for his cause of action against the Defendants, Ohio University, Molly Bukky, Kristen Hayes, Kerri Griffin, G. Antonio Anaya, and John Roes 1-5  states the following:

**NATURE OF THE ACTION**

1.     This action arises from sex discrimination, unlawful retaliation, and violations of the Title IX of the Education Amendments of 1972 ("Title IX"); Plaintiff's Due Process rights as afforded to him by the Fourteenth Amendment of the United States Constitution; and breach of contractual obligations and promises by Defendants. These violations and breaches resulted in erroneous findings of responsibility and sanctions against Plaintiff after he was falsely accused

---

[1] Plaintiff is contemporaneously filing a Motion for Permission to Proceed under Pseudonym.  Plaintiff is entitled to proceed anonymously because of the highly sensitive nature of the disciplinary proceedings against him that form the basis of this Complaint, and the fact that the University is fully aware of his identity and will not be prejudiced in any way.

2

and found liable for violating University Policies on Sexual Harassment and Other Sexual Misconduct (University Policy 03.004).

2.    After Plaintiff, a male student, was falsely accused of various forms of dating violence by Jane Roe, a female student, Defendants put Plaintiff through a deeply flawed, impartial, discriminatory and bias-ridden process, which unjustifiably resulted in Plaintiff being, among other things, expelled from the University.

3.    The process utilized by Defendants was, at all relevant times, set forth in the University's Policy on Sexual Harassment and Other Sexual Misconduct. Both on its face and as applied, these policies and procedures violated Plaintiff's Fourteenth Amendment Right to Due Process, his rights under Title IX, and were a material breach of the express and implied contract that existed between Plaintiff and Ohio University (hereinafter "OU").

## JURISDICTION

4.    This Court has jurisdiction pursuant to 28 U.S.C §1331, 28 U.S.C. §1343, 42 U.S.C. §1983 and §1988, 20 U.S.C. §1681, et seq., and the Fourteenth Amendment to the Constitution of the United States of America.

5.    Supplemental jurisdiction over Plaintiff's state law claims is invoked pursuant to 28 U.S.C. § 1376 as the claims arise out of the same transaction and occurrences as Plaintiff's federal claims.

## VENUE

6.    Venue is appropriate under 28 U.S.C. § 1391(b).

## PARTIES

7.    Plaintiff, John Doe, is a natural person who is a citizen of North Carolina, currently residing in Mississippi, where he attends school. At all relevant times, Plaintiff was enrolled as a

full-time, tuition paying student at OU. At all relevant times, Plaintiff was a member of the OU basketball team, and had several prospectus Name, Image, and Likeness ("NIL") deals/endorsements.

8.      Defendant, Ohio University, is a public university organized and existing under the laws of the State of Ohio, with its principal place of business located at 1 Ohio University, Athens, Ohio 45701.

9.      Defendant OU receives, and at all relevant times received, federal financial assistance and is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq*.

10.      Defendant Molly Bukky was, at all relevant times to this action, an employee of OU, serving as Training Coordinator and Civil Rights Investigator. Defendant Bukky is sued in her individual and official capacities. Defendant Bukky is a person under 42 U.S.C. § 1983 and at all times relevant to this action acted under color of state law. This Defendant's actions were final and support her designation as a final policy maker.

11.      Defendant Kristen Hayes was, at all relevant times to this action, an employee of OU, serving as Civil Rights Investigator. Defendant Hayes is sued in her individual and official capacities. Defendant Hayes is a person under 42 U.S.C. § 1983 and at all times relevant to this action acted under color of state law. This Defendant's actions were final and support her designation as a final policy maker.

12.      Defendant Kerri Griffin was, at all relevant times to this action, an employee of OU, serving as Director of Civil Rights Compliant and Title IX Coordinator. Defendant Griffin is sued in her individual and official capacities. Defendant Griffin is a person under 42 U.S.C. § 1983

and at all times relevant to this action acted under color of state law. This Defendant's actions were final and support her designation as a final policy maker.

13.     According to OU's own policies, Defendant Griffin was obligated to "ensure compliance with Title IX and oversee the implementation of [Policy 03.004]."

14.     Defendant G. Antonio Anaya was, at all relevant times to this action, an employee of OU, serving as Civil Rights Investigator. Defendant Anaya is sued in his individual and official capacities. Defendant Anaya is a person under 42 U.S.C. § 1983 and at all times relevant to this action acted under color of state law. This Defendant's actions were final and support her designation as a final policy maker.

15.     Defendants Roes 1-5 were at all relevant times to this action employees of OU and they are final decisionmakers. Defendants Roes 1-5 are sued in their individual capacities. Defendants Roes 1-5 are persons under 42 U.S.C §1983 and at all times relevant to this action acted under color of state law.

## FACTUAL BACKGROUND

16.     In 2023, Plaintiff was a full-time student at OU. Plaintiff was a member of the men's basketball team, receiving a scholarship and entertaining Name, Image, and Likeness ("NIL") endorsements.

17.     Plaintiff was set to graduate from OU in May, 2024.

18.     In 2023, Jane Roe was a full-time student at OU. At all relevant times, Ms. Roe was a student-athlete at OU as a member of the track team.

19.     In September, 2023, Plaintiff and Ms. Roe were in a romantic relationship.

20.     During this timeframe, it was ordinary for Plaintiff to sleep at Ms. Roe's apartment.

21.     On September 12, 2023, Plaintiff was present at Ms. Roe's apartment.

22. In the early morning hours of September 13, 2024, Plaintiff discovered evidence that Ms. Roe was cheating on him.

23. Plaintiff confronted Ms. Roe about this evidence. In response, Ms. Roe became angry at Plaintiff for allegedly violating her privacy by looking at her cell phone.

24. At no time during this argument did Plaintiff hit, choke, strangle, push, harm, or threaten Ms. Roe. At no time did Plaintiff pull Ms. Roe's hair.

25. At the conclusion of the argument, Plaintiff told Ms. Roe that it would be best if they took some space from each other. The two went to bed together with the understanding that they would take a break in their relationship.

26. The next morning, Plaintiff left Ms. Roe's apartment without incident.

27. Later that morning, Plaintiff received a communication from Ms. Roe's mother, threatening to file a police report. This was the first time Plaintiff learned of any type of allegation against him.

28. Prior to speaking with Ms. Roe's mother, Plaintiff spoke to Ms. Roe, who told Plaintiff to apologize to her mother. When Plaintiff asked Ms. Roe what he would be apologizing for, Ms. Roe refused to tell him. Ms. Roe never mentioned any violence.

29. From there, and continuing throughout the OU's student conduct process, Ms. Roe used these false allegations to manipulate and control Plaintiff into continuing a relationship with her.

30. On September 16, 2023, Ms. Roe submitted a formal complaint to OU's Equity and Civil Rights Compliance office. In her complaint, Ms. Roe falsely accused Plaintiff of shouting at her, strangling her, pulling her hair, pushing her, and threatening her.

31.     At the time of the alleged altercation, at least one of Ms. Roe's roommates were home. Despite Ms. Roe's claims of a violent and loud attack, no one witnessed or overheard any altercation.

32.     As a result of these false allegations, OU charged Plaintiff with dating violence, pursuant to University Policy 03.004.

33.     Despite a no-contact order being in place, Ms. Roe routinely contacted Plaintiff and attempted to pursue a relationship with him. Ms. Roe routinely attempted to control Plaintiff's behavior by reminding him of the allegations, telling Plaintiff that she was dismissing the case, and requesting that they spend time with each other.

34.     Ms. Roe claimed that she filed a police report. However, no charges have ever been filed, nor has law enforcement ever contacted Plaintiff.

***The University's Policies and Procedures for Claims of Sexual Misconduct.***

35.     In handling complaints of sexual misconduct, OU and its employees are bound to follow federal law, including but not limited to Title IX of the Education Amendments of 1972 ("Title IX"), related regulations, and judicial precedent.

36.     At the time of the alleged offense, all sexual misconduct allegations, whether on or off campus, were subject to University Policy 03.004: Sexual Harassment and Other Sexual Misconduct, which sets forth definitions and procedures that must be followed by the University. *(See Exhibit A.)*

37.     OU is in exclusive possession of its prior policies. Upon information and belief, the version of Policy 03.004 that was in place for the 2023-2024 academic year was the same and/or substantially similar to the current version of Policy 03.004 attached as *Exhibit A*.

38.     Policy 03.004 states "[t]o affirm this commitment and ensure compliance with federal and state laws and regulations, Ohio university has developed this policy and related processes to inform members of the university community about prohibited behavior; provide supportive measures designed to remediate the effects of sexual harassment and other sexual misconduct; and ensure a prompt, fair, and impartial process for addressing alleged violations of this policy."

39.     Policy 03.004 defines a "complainant" as, "an individual who is alleged to have been subjected to conduct that could constitute sexual harassment, other sexual misconduct, or retaliation under this policy."

40.     Policy 03.004 defines a "respondent" as, in part, "an individual who is alleged to have engaged in conduct that could constitute sexual harassment, other sexual misconduct, or retaliation under this policy. "

41.     In investigating and adjudicating Ms. Roe's claims, Defendants were obligated to follow the University's own policies and procedures as outlined in Policy 03.004, as well as Title IX.

42.     Policy 03.004 defines dating violence as, "violence or threat of violence, committed by a person who is in or has been in a social relationship of a romantic or intimate nature with the complainant."

43.     Policy 03.004 promises that "the Title IX coordinator manages the Title IX team and acts with independence and authority, free from bias and conflicts of interest. The Title IX coordinator oversees all processes under this policy. The members of the Title IX team are vetted and trained to ensure they are not biased for or against any party in a specific case, or for or against complainants or respondents, generally."

44.     Policy 03.004 requires that "the standard of evidence applied to determine responsibility for violating this policy is the preponderance of the evidence standard. The preponderance of the evidence means that the statements and information presented in the matter must indicate to a reasonable person that it is more likely than not that the respondent committed a violation."

45.     Policy 03.004 further states, "investigation and adjudication of formal complaints under this policy will be conducted pursuant to the sexual harassment and other sexual misconduct grievance process."

46.     According to OU, its Process "provides for a prompt, fair, and impartial investigation and resolution of allegations made against students, student organizations and groups, faculty members, administrators, staff members, and trustees and officers of Ohio University. The Title IX Coordinator and the staff in Civil Rights Compliance (CRC) are responsible for the management and implementation of this process." *See* Sexual Harassment and Other Sexual Misconduct Grievance Process attached hereto as *Exhibit B.*

47.     OU's grievance procedure defines "Advisor" as, in relevant part, "a person chosen by a party (the complainant or respondent) to accompany the party to meetings related to the grievance process, to advise the party on that process, and to question the other party and witnesses at the hearing, if any… The advisor may assist the party by helping to prepare materials, draft questions, and confer with the party during meetings and hearings, as long as this does not unreasonably disrupt or delay the process. The advisor also represents the party by asking questions of the other party and witnesses at the hearing."

48.     OU's grievance procedure promises that "two investigators will be assigned to each case and will conduct a prompt, thorough, and impartial investigation."

9

49.     According to OU's grievance procedure, an initial meeting with the complainant is held as soon as possible upon receipt of a report of alleged sexual misconduct. The purpose of this meeting is to, in part, discuss the complainant's immediate safety and well-being and provide resources and/or supportive measures.

50.     No such meeting is contained for the respondent in OU's grievance procedure.

51.     Under OU's grievance procedure, "grievance process pool members receive annual training based on their assigned roles. This training includes topics appropriate for the roles filled by each member of the pool, which may include, but are not limited to, the following:

    a.  Conducting investigations and hearings in a manner that protects the safety of complainants and respondents and promotes accountability;

    b.  Serving impartially and objectively by avoiding prejudgment of the facts at issue, conflicts of interest, and bias;

    c.  Upholding fairness, equity, and due process;

    d.  Conducting the grievance process, including the investigation, hearing, and appeals, in a thorough, reliable, and impartial manner;

    e.  Conducting questioning;

    f.  Issues of relevance of questions and evidence in the creation of an investigative report and/or in a hearing;

    g.  Assessing credibility;

    h.  Weighing evidence;

    i.  Rendering findings and generating clear, concise, evidence-based rationales."

52.    Training pool members on how to conduct investigations and hearings in a matter that "promotes accountability" is synonymous with training pool members to hold respondents, such as Plaintiff, responsible for alleged violations.

53.    Under OU's grievance procedures, "any individual materially involved in the administration of the grievance process (including the Title IX Coordinator, Investigators, hearing panelists, and appeal officers) may neither have nor demonstrate a conflict of interest or bias for complainants or respondents generally, or for a specific complainant or respondent."

54.    The policy further provides, "the grievance process involves an objective evaluation of all relevant evidence obtained, including evidence that supports that the respondent engaged in a policy violation and evidence that supports that the respondent did not engage in a policy violation. Credibility determinations may not be based solely on an individual's status or participation as a complainant, respondent, or witness."

55.    Under OU's grievance procedure, "Ohio University operates with the presumption that the respondent is not responsible for the reported misconduct unless and until the respondent is determined to be responsible for a policy violation by the preponderance of the evidence."

56.    Per OU's grievance procedure, "All investigations are thorough, reliable, impartial, prompt, and fair. Investigations involve interviews with all relevant parties and witnesses; obtaining available, relevant evidence; and identifying sources of expert information as necessary. All parties have a full and fair opportunity, through the investigation process, to suggest witnesses and questions, to provide evidence and expert witnesses, and to fully review and respond to all evidence on the record."

57.    Prior to a hearing, the policy requires that the parties will receive a notice of hearing. Said notice will contain, in part:

11

a. The time, date, and location of the hearing;

b. Any technology that will be used to facilitate the hearing;

c. If the live hearing will be held in person or via video technology and the process for requesting alternate arrangements for hearing participation if it is scheduled to be held in person;

d. A statement that if any party or witness does not appear at the scheduled hearing, the hearing may be held in their absence. If a party or witness does not participate in the hearing, verbal or written statements made by the party or witness as a part of the investigation will not be considered by the hearing authority in their deliberations if the party's or witness's credibility is in dispute and material to the outcome of the hearing. Evidence provided by that party or witness that is something other than verbal or written statements made by that party or witness as a part of the investigation may be considered by the hearing panel regardless of participation by the party or witness in the hearing. For compelling reasons, the hearing chair, in consultation with the Title IX Coordinator, may reschedule the hearing;

e. Notification that the parties may have the assistance of an advisor of their choosing at the hearing and will be required to have one present to ask questions of the other party and witnesses. If they do not have an advisor, the Title IX Coordinator will appoint one for them; and

f. An invitation for each party to submit a written impact statement, including any sanctioning requests, should the respondent be found in violation, to the Title IX Coordinator prior to the hearing. The impact statement(s) will be held by the

Title IX Coordinator and only provided to the hearing panel if the respondent is determined to be in violation and the hearing panel is making a sanctioning determination.

58. Per OU's grievance procedure, "if the hearing is scheduled to take place in person and a party or parties prefer not to or cannot attend in this manner, the party should request alternative arrangements from the investigators at least five (5) business days prior to the hearing so that the investigators can arrange to use technology to allow remote testimony."

59. As set forth in the policy, "upon completion of the investigative report, the investigators will schedule separate pre-hearing meetings for the parties. The parties may each be accompanied at their pre-hearing meeting by an advisor and up to two support people as defined in Section 1. The pre-hearing meetings will be scheduled at least five (5) business days prior to the hearing. The purpose of the pre-hearing meeting is to allow the investigators to answer any final questions the parties and their advisors may have and to clarify logistical matters such as confirming the identity of the parties' advisors and any requests the parties may have regarding their means of participation (i.e., remote participation by video technology). If a party does not attend the scheduled pre-hearing meeting, it will be cancelled, but the party may ask questions of the investigators as needed."

60. The policy further provides that , "the following is a guide as to how the hearing will be conducted:

    a. The hearing chair will begin the hearing by discussing expectations for the hearing.

    b. The hearing chair will give a brief overview of the nature of the allegations.

    c.  The hearing panel may ask the investigators clarifying questions regarding the investigation at any point during the hearing.

    d.  The complainant will be given an opportunity to respond to the investigative report.

    e.  The hearing panel will have an opportunity to ask the complainant questions.

    f.  The respondent's advisor will be given the opportunity to ask relevant questions of the complainant as described below.

    g.  The respondent will be given an opportunity to respond to the investigative report.

    h.  The hearing panel will have an opportunity to ask respondent questions.

    i.  The complainant's advisor will be given the opportunity to ask relevant questions of the respondent as described below.

    j.  The hearing panel will call witnesses and ask them questions.

    k.  The complainant's advisor will be given the opportunity to ask relevant questions of witnesses as described below.

    l.  The respondent's advisor will be given the opportunity to ask relevant questions of the witnesses as described below.

    m.  The complainant will be given the opportunity to make a summary statement.

    n.  The respondent will be given the opportunity to make a summary statement."

61.    Per OU's policies and procedures, the hearing is designed to be fair, thorough, and impartial.

62.    Under OU's policies and procedures, a respondent is entitled to have his or her advisor conduct meaningful cross-examination of the complainant and any witnesses.

63.     Per OU's policies and procedures, participants in the grievance process are not permitted to influence or coerce the testimony of any other party and/or witness.

64.     Nor is a participant in the grievance is not permitted to intentionally tamper with the grievance process.

65.     According to OU's grievance process, the first listed right of a respondent such as Plaintiff, is the right to have a fundamentally fair resolution.

66.     In response to Ms. Roe's false allegations, OU opened an investigation pursuant to the policy and procedures contained herein.

67.     Defendants Bukky and Hayes were assigned as the investigators.

68.     During the course of the investigation, multiple witnesses were interviewed, including Ms. Roe's friends, R.G., and L.M. These individuals were not present for the alleged altercation, nor did they have any firsthand knowledge of the events.

69.     Ms. Roe's mother was also interviewed. Ms. Roe's mother was not present for the alleged altercation, nor did she have any firsthand knowledge of the events.

70.     Ms. Roe's roommates were also interviewed. Despite at least one roommate being present in the apartment during the timeframe in question, each roommate testified that they did not hear anything of concern, nor did they hear what Ms. Roe alleged to be a violent and presumably loud altercation.

71.     The fact that Ms. Roe's roommates did not hear anything given their close proximity to Ms. Roe's bedroom is relevant and exculpatory.

72.     On December 19, 2023, Plaintiff and his advisor, Attorney Andrew Grillo, were present for a pre-hearing meeting, pursuant to OU's grievance procedure.

73.     Defendants Bukky and Hayes were present at the pre-hearing meeting.

74. During this meeting, Defendant Bukky and Hayes outlined the hearing order, which was consistent with the order contained in OU's grievance procedure. Namely, Ms. Roe was scheduled to testify first, followed by Plaintiff, and then the witnesses. Said procedure is consistent with Title IX and Sexual Misconduct procedures across the country.

75. Following the meeting, OU sent a letter to Plaintiff, reiterating the aforementioned hearing order.

76. Upon information and belief, Ms. Roe was notified of this order in advance of the hearing.

77. On January 8, 2024, Ms. Roe notified her university appointed advisor that she no longer wished to participate in the grievance process. Upon information and belief, this information was then relayed to Defendants.

78. Prior to the hearing, Ms. Roe contacted Plaintiff to tell him that she was requesting that the case be dismissed and that she refused to participate in the hearing as scheduled.

79. At the time of making these statements, Ms. Roe knew that she was lying to Plaintiff.

80. In reality, Ms. Roe wanted Plaintiff to think that she would not appear or participate in the hearing so she could later manipulate the process and the testimony of the witnesses.

81. On January 10, 2024, Plaintiff's advisor sent an email to Defendant Griffin inquiring about the status of the hearing and requesting the names of witnesses to be present.

82. On January 11, 2024, Defendant Griffin responded to Plaintiff's advisor's email, stating that Ms. Roe had not confirmed whether she will attend the hearing, but that all parties and witnesses have been reminded about the hearing. Defendant Griffin also promised that Defendants will follow OU's policy and procedure.

16

83.     Upon information and belief, Defendants did not ask Ms. Roe's roommates to attend the hearing as witnesses because they did not hear anything.

84.     As aforementioned, the fact that they did not hear anything is relevant and exculpatory based on the nature of the allegations.

85.     Defendants provided no rationale for refusing to call the roommates as witnesses.

86.     At the time of making this statement, Defendant Griffin was previously informed by Ms. Roe's advisor that she no longer wished to participate in the process.

87.     On January 12, 2024, the formal hearing was held. Plaintiff appeared with his advisor at 8:30 AM, as directed by Defendants.

88.     Defendant Anaya served as the hearing chair. Cailtin Oiler and Matt Ward were appointed as the other two members of the panel.

89.     Based upon the statements made by Defendants, Plaintiff understood that Ms. Roe was also directed to appear at 8:30 AM, with her testimony to begin shortly thereafter.

90.     Ms. Roe did not appear at 8:30 AM. Prior to the hearing, Ms. Roe made no attempts to contact her advisor or any Defendants to notify them that she was unable to attend the hearing as scheduled, nor did she request alternative arrangements or that the hearing be rescheduled. Rather, Ms. Roe informed her advisor that she did not wish to participate.

91.     Prior to moving forward with the hearing, Defendants Bukky and Hayes listed, for the record, their efforts and notices provided to Ms. Roe to inform her of the time and date of the hearing.

92.     Ms. Roe's advisor confirmed receipt of these notices and failed to provide any explanation for Ms. Roe's absence.

93.     Ms. Roe willfully and intentionally skipped her scheduled time to testify, thereby waiving her right to testify, and interfering with Plaintiff's right to confront his accuser by way of cross examination through his advisor.

94.     Nevertheless, OU persisted with the hearing, requiring Plaintiff to testify first. Plaintiff testified and denied Ms. Roe's allegations. After providing his own response, Plaintiff credibly and honestly answered any and all questions posed by the hearing panel. Throughout the entirety of Plaintiff's testimony, he continuously denied the allegations raised by Ms. Roe.

95.     During the hearing, Ms. Roe's advisor was permitted to remain in the hearing and listen to the testimony of Plaintiff.

96.     During questioning, Defendant Anaya and the hearing panel repeatedly asked Plaintiff to explain the photos provided by Ms. Roe during the investigation, which included marks on her body and hair. Ms. Roe claimed that these marks were a result of the physical altercation.

97.     In response, Plaintiff stated that he did not know how Ms. Roe received those marks and did not want to speculate. However, he continued to deny that he caused the injuries depicted in the photos.

98.     During Plaintiff's testimony, he requested that he be permitted to show the panel a blueprint of Ms. Roe's apartment to demonstrate that it is implausible that Ms. Roe's roommates would not hear an altercation of the kind claimed by Ms. Roe. This was particularly important given Defendants refusing to call the roommates as witnesses.

99.     Plaintiff's request was denied because the blueprint was not part of the evidence collected during the investigation.

100.    The purpose of the blueprint was merely for demonstration and clarification purposes.

101.    Plaintiff would not have needed the blueprint had Defendants called Ms. Roe's roommates to testify.

102.    Following Plaintiff's testimony, Ms. Roe's track coach, Steven Champlin, was called to testify.

103.    Following Mr. Champlin's testimony, Defendant Anaya announced that the remaining witnesses were not scheduled until the afternoon and called for the break in the hearing.

104.    When the hearing resumed hours later, the first witness to be called was R.G., one of Ms. Roe's friends and track teammates.

105.    When R.G. appeared on the zoom meeting, she was sitting next to Ms. Roe, as the two rode on a team bus to a track meet.

106.    Ms. Roe provided no explanation at that time for her earlier absence, or why she was sitting next to R.G. directly prior to her testimony, a violation of OU's policies and procedures.

107.    In response, Defendant Anaya raised the issue with Ms. Roe and R.G. Defendant Anaya then permitted R.G. to testify from the team bus's bathroom, mere feet from Ms. Roe.

108.    During R.G.'s testimony, Defendant Anaya expressed concern that Ms. Roe was still sitting next to R.G. while being questioned. However, he took zero steps to remedy the situation and allowed R.G. to testify as normal.

109.    Plaintiff's advisor began to object and raise concerns about the clear violation of the rules, and more importantly, a direct attempt by Ms. Roe to tamper with and/or influence a witness. In response, Defendant Anaya told Plaintiff's advisor to stop talking.

110.    Following R.G.'s testimony, Ms. Roe's mother, M.B., testified.

111.    During her testimony, M.B. was in a vehicle with other individuals present. The identity of these other individuals was never revealed.

19

112.    During her testimony, M.B. admitted that she had spoken to Ms. Roe prior to testifying. M.B. also admitted that she had been texting Ms. Roe during her own testimony, and that she planned to continue to text Ms. Roe during her testimony.

113.    This was Ms. Roe's second act of tampering with and/or influencing a witness.

114.    Despite these admissions, Defendant Anaya continued to allow M.B. to testify and made no attempt to correct this procedural error.

115.    At no time did Defendant Anaya request to review the communication between M.B. and Ms. Roe.

116.    Defendant Anaya then allowed M.B. to testify as to victim-impact evidence, contrary to OU policy and procedure.

117.    Again, Plaintiff's advisor objected and raised concerns about M.B. and Ms. Roe's behavior. In response, Defendant Anaya told Plaintiff's advisor to stop talking.

118.    Following M.B.'s testimony, Ms. Roe's friend, L.M., was called to testify.

119.    During her testimony, L.M. admitted that she had also been communicating with Ms. Roe during the day, including during the hearing and her testimony.

120.    L.M. also admitted that she, Ms. Roe, and R.G. were communicating with each other in a group chat throughout the day and hearing.

121.    This was the third time Ms. Roe was communicating with, tampering with, and/or influencing a witness.

122.    R.G. did not reveal that she was communicating with L.M., another violation of OU's policy and procedure.

123.    At no time did Defendant Anaya seek to review any of these communications.

124. In these communications, Ms. Roe was coaching and/or telling the witnesses what to say.

125. During the afternoon portion of the January 12, 2024 hearing, Ms. Roe requested that she be permitted the opportunity to testify. In making this request, Ms. Roe gave no reason for her absence in the morning.

126. Ms. Roe intentionally avoided her scheduled testimony in an attempt to manipulate the grievance procedure. Specifically, Ms. Roe did not want to testify first. Rather, Ms. Roe wanted to hear the testimony of Plaintiff and her witnesses, whom she coached, before testifying herself.

127. Despite Ms. Roe's clear gamesmanship, her continued violation of OU's policy and procedure, her multiple attempts to tamper with witnesses, and her inability to provide a compelling reason for her absence, Defendant Anaya granted Ms. Roe's request.

128. Defendant Anaya's decision was without reason, lacked any modicum of fairness to Plaintiff, and violated OU's own procedures.

129. Defendant Anaya also allowed Ms. Roe to join and exit the hearing as she pleased during the afternoon portion of the January 12, 2024 hearing, presumably so she could continue to contact and tamper with witnesses.

130. Defendant Anaya then scheduled Ms. Roe's testimony for January 24, 2024.

131. Defendant Anaya allowed Ms. Roe twelve days to work with her advisor, review the testimony of Plaintiff and multiple witnesses, and craft her statement in conformity with this testimony.

132. On January 24, 2024, the panel reconvened.

133. Defendant Anaya then allowed Ms. Roe to testify with the benefit of knowing exactly what Plaintiff and other witnesses testified to.

21

134.    During her testimony, Defendant Anaya allowed Ms. Roe to provide victim-impact evidence, in direct violation of OU policy and procedure.

135.    During her testimony, Ms. Roe began discussing additional pieces of evidence that were not turned over during the investigation. Specifically, Ms. Roe testified as to items located on her phone but never revealed to investigators.

136.    According to OU policy and procedure, evidence must be provided during the investigation in order to be reviewed, used, or discussed during the hearing.

137.    Despite Ms. Roe purposefully hiding this information until the hearing, Defendant Anaya allowed her to use and discuss this evidence, in contradiction to her decision to bar the use of the blueprint previously.

138.    Prior to the January 24, 2024 hearing, Plaintiff had never seen or been made aware of the existence of this evidence.

139.    During Plaintiff's cross-examination of Ms. Roe, Ms. Roe repeatedly gave evasive answers. When Plaintiff's advisor attempted to ask follow-up questions to these evasive answers, Defendant Anaya refused to allow the follow-up questions, calling them "abusive."

140.    For example, Plaintiff's advisor asked Ms. Roe how many seconds it would take to travel from her bedroom to one of her roommate's bedrooms.

141.    This question was relevant to understand how close Ms. Roe's roommates would have been to the altercation.

142.    In response, Ms. Roe said, "more than five seconds." When Plaintiff's advisor attempted to ask for a more specific timeframe, Defendant Anaya told Ms. Roe not to answer the question. Defendant Anaya then berated Plaintiff's advisor, calling this line of questioning "abusive."

22

143. Defendant Anaya repeatedly interrupted Plaintiff's advisor's cross-examination questions, which in turn rewarded Ms. Roe's evasiveness. On one occasion, Defendant Anaya threatened to end the hearing in response to Plaintiff's advisor asking simple and relevant follow-up questions.

144. During her testimony, Ms. Roe claimed that she was not sitting next to R.G. at any point during the January 12 hearing, a demonstrable lie.

145. Ms. Roe also admitted that, despite claiming that Plaintiff violently attacked her on the night in question, she willingly slept in bed with him until the following morning, when Plaintiff left without incident. Ms. Roe provided no explanation for this inconsistent behavior.

146. Defendant Anaya effectively stripped Plaintiff of his right to meaningfully cross-examine Ms. Roe.

147. On February 1, 2024, Defendant Griffin authored a letter to Plaintiff, notifying him that the panel had found Plaintiff Responsible for the alleged policy violations.

148. To support its conclusion, Defendant Griffin wrote that the panel found that Ms. Roe and the witnesses all corroborate each other. Because of this "corroboration," the panel found Ms. Roe and each of these witnesses credible.

149. This corroboration was based on Ms. Roe tampering with and/or influencing the witnesses as they testified, as well as her own gamesmanship in manipulating the hearing procedure so she could testify with the benefit of knowing what each witness already said.

150. Moreover, each of the witnesses who "corroborated" Ms. Roe's version of the events had no first-hand knowledge of the allegations and merely repeated what Ms. Roe had told them, before and during, the hearing.

151. In evaluating Ms. Roe's credibility, the decision letter stated that "the Hearing Panel finds [Ms. Roe] to be generally credible," again supporting this conclusion by discussing the other witnesses' testimony.

152. The decision letter is silent as to:

a. Ms. Roe intentionally failing to appear for her testimony as scheduled;

b. The fact that Ms. Roe was sitting next to R.G. during her testimony;

c. The fact that Ms. Roe was communicating with all three witnesses during their respective testimony;

d. The fact that Ms. Roe was given twelve days to work with her advisor to craft and prepare her testimony, all while having the benefit of hearing all other testimony in the case;

e. The fact that Ms. Roe willingly hid evidence from the investigator for the purpose of surprising Plaintiff with the evidence at the hearing;

f. Ms. Roe's blatant manipulation of the witnesses and the process overall;

g. R.G.'s willingness to communicate with Ms. Roe during her testimony;

h. R.G. hiding that she was also communicating with L.M. during both their testimonies;

i. M.B.'s willingness to communicate with Ms. Roe during her testimony;

j. L.M.'s willingness to communicate with Ms. Roe and R.G during their respective testimonies;

k. Ms. Roe's evasiveness while answering questions on cross-examination; and

l. Ms. Roe's inconsistent statements and behaviors;

m. Ms. Roe's willingness to lie about her involvement with R.G. on January 12, 2024; and

n. The fact that none of Ms. Roe's roommates heard anything on the night in question.

153. Ms. Roe and the other witnesses' behaviors, outlined in Paragraph 152, casted serious doubt on their respective credibility.

154. Defendants intentionally and willingly ignored these credibility issues and manipulated the process in order to find Plaintiff responsible for the policy violations.

155. In assessing Plaintiff's credibility, the decision letter stated that Plaintiff was found to be "not credible" because he was unable to give an alternative explanation as to the photographs depicting Ms. Roe's alleged injuries.

156. The decision letter also referenced that Plaintiff's alternative explanation as to the reason R.G. drove to see Ms. Roe the following morning was not credible because he could not provide any evidence to support his theory.

157. The decision letter indicates that Defendants improperly shifted the burden of proof onto Plaintiff. Defendants required that Plaintiff prove that he was innocent by proving some alterative theory. Because Plaintiff was unable to provide more than a repeated denial of wrongdoing, Defendants determined that he was not credible and did not satisfy the burden they placed upon him.

158. The decision letter indicates that Defendants improperly placed a burden on Plaintiff to prove Ms. Roe's motive to fabricate allegations against him.

159.    The decision letter included reference to a study conducted, wherein the study purports to show that victims of domestic violence that included strangulation are 750% more likely to be killed than domestic violence victims who were never strangled.

160.    No such study was ever discussed at the hearing, was not part of the evidence in this matter and is not relevant to the instant matter.

161.    As a result of the flawed decision, Plaintiff was expelled from the University, effective February 2, 2024.

162.    Plaintiff timely appealed the University's decision.

163.    Megan Vogel was appointed as the appeal officer.

164.    In his appeal, Plaintiff highlighted Defendants' flawed credibility determinations, Ms. Roe's manipulation, the improper burden shifting onto Plaintiff, and Defendant Anaya stripping him of his right of cross-examination.

165.    Additionally, in response to Ms. Roe being permitted to introduce new evidence at the January 24, 2024 hearing, Plaintiff attempted to introduce evidence that only became relevant based on Ms. Roe's late introduction of evidence. This included messages and phone calls that directly contradicted allegations made in Ms. Roe's testimony, such as Ms. Roe telling Plaintiff that she dropped the case against him and attempting to convince him to violate the no-contact order put in place by OU.

166.    These text messages also contradicted Ms. Roe's testimony that she was afraid of Plaintiff, as she routinely tried to spend time with him.

167.    This new evidence was ignored by Defendants.

168.    On March 18, 2024, Defendant Griffin authored a letter denying Plaintiff's appeal.

26

169.   All of the University officials involved in this matter started with a presumption that Plaintiff was responsible. This is consistent with the "Survivor Advocacy" that is highlighted, celebrated, and encouraged by Defendants. https://www.ohio.edu/survivor

170.   Defendants applied the "start by believing" approach highlighted by Defendants' "Survivor Advocacy" Program when it adjudicated Ms. Roe's claims.

***Ohio University's Culture of Male Discrimination***

171.   The unlawful, differential, and discriminatory treatment of Plaintiff was based on a deeply rooted atmosphere and culture at OU in discriminating against male students in the student disciplinary process.

172.   In part, through the "Survivor Advocacy" Program, Defendants have created a culture based on the directive that women are always to be believed, that women are victims, and that males who are accused of misconduct are predators who must be removed from the University.

173.   The Survivor Advocacy program speaks on behalf of the University as a whole and reflects the University's position and voice relative to the issues set forth herein.

174.   "Ohio University's Survivor Advocacy Program's (SAP) mission is to provide confidential support and advocacy services to student survivors of sexual assault, sexual harassment, dating/domestic violence, and stalking. We work to increase student survivors' access to support and resources through survivor-centered advocacy and empowerment." https://www.ohio.edu/survivor

175.   "At the Survivor Advocacy Program, survivors will be believed and supported." *Id.*

176.   OU, nor the Survivor Advocacy Program question the truth of any allegation. *Id.*

177.   Only women appear on the "Survivor Advocacy" webpage. https://www.ohio.edu/survivor/about-sap/who-we-are

178. During the 2023-2024 school year, only women worked at "survivor advocates."

179. The Survivor Advocacy Program's Instagram page features primarily women.

180. "'Start by Believing' – first brought to campus by the Ohio University Police Department (OUPD) and the Survivor Advocacy Program (SAP) – is going strong at Ohio University." https://www.ohio.edu/survivor/get-involved/start-believing

181. According to OU's website, "the Ohio University Police Department & Survivor Advocacy Program partnered with Ohio University's University Communication and Marketing team to create a documentary to allow Brie's story to continue being told. This 30-minute movie shows Brie's journey from victim, to survivor, to aspiring social worker and illustrates how OUPD works to empower survivors throughout their sexual assault investigations. You will also hear about trauma's impact on memory and witness the impact possible when police and advocacy work together with a common goal." *Id.*

182. This "start by believing" and "survivor centered" process was used by OU to dismiss and justify Ms. Roe's clear and significant credibility concerns.

183. Ohio University also features a "Women's Center," which echoes the sentiments and beliefs pushed by the Survivor Advocacy Program.

184. Together, the Survivor Advocacy Program and the Women's Center have created an environment and belief on OU's campus that women who allege misconduct must be believed.

185. These discriminatory beliefs led Defendants to:

    a. Ignore Ms. Roe's credibility issues, including her willful manipulation of the process, tampering with witnesses, her strange behavior after the alleged assault, her omission of evidence, and her demonstrable false statements;

28

b. Ignore the credibility issues of the other witnesses, including their communications with Ms. Roe during their respective testimony;

c. Shift the burden of proof onto Plaintiff to prove his innocence, as well as a motive for Ms. Roe to fabricate her claims;

d. Strip Plaintiff of his ability to have his advisor effectively cross-examine Ms. Roe;

e. Treat Plaintiff and Ms. Roe differently, particularly in allowing Ms. Roe to introduce new evidence at the hearing, while denying Plaintiff the same opportunity, as well as allowing Ms. Roe to control the entire hearing process through her gamesmanship;

f. Engage in several material procedural irregularities, all of which benefited Ms. Roe;

g. Ignore the exculpatory evidence provided by Ms. Roe's roommates; and

h. Erroneously conclude that Plaintiff was responsible for the alleged policy violations.

## **COUNT I**

**Discrimination in Violation of Title IX of the Education Amendments of 1972
(Against OU)**

186. Plaintiff repeats and realleges each and every allegation set forth above as if fully rewritten herein.

187. Defendants' disciplinary proceedings against Plaintiff, as detailed above, violated Title IX of the Education Amendments of 1972 and/or subsequent regulations.

188. Defendants discriminated against Plaintiff and deprived him of the benefits of its education program through its discriminatory, gender-based implementation of its disciplinary

29

process, by refusing to treat Plaintiff in a manner consistent with which they treated Ms. Roe, and by expelling him as a result of that process,

**A. Starting in 2011, the federal government pressured educational institutions to provide more protection to students alleging sexual misconduct and harassment, focusing on protection of women.**

189. In the years leading up to the incident in question, colleges in the United States, including OU, have been subjected to pressure from the federal government, the public, and members of college communities to take campus sexual misconduct more seriously, provide more protection to purported victims, and crack down on purported offenders.

190. On April 4, 2011, the Office of Civil Rights in the U.S. Department of Education ("OCR") issued a "significant guidance document" commonly referred to as the 2011 "Dear Colleague Letter." Letter from Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights (Apr. 4, 2011) at n.1, available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf (hereinafter "2011 Dear Colleague Letter").

191. Although the letter marked a substantial change in OCR's position on how schools should handle disciplinary proceedings under Title IX, OCR did not conduct the public notice and comment process required for proposed regulations. See Administrative Procedure Act, 5 U.S.C. § 553.

192. The press release announcing the letter stated that it was "the first specifically advising schools, colleges and universities that their responsibilities under Title IX include protecting students from sexual violence," and that it included "new steps to help our nation's schools, universities and colleges end the cycle of sexual violence on campus." The press release made clear the focus was on protecting women: it stated that despite past progress "the threat of

violence and abuse continues for a new generation of women"; it lauded the "unprecedented coordination and cooperation across the federal government to combat violence against women"; it stated that one in five women "will be a victim of sexual assault during college"; and it highlighted "the Administration's commitment to raising awareness and promoting policies to prevent sexual violence against women of all ages." *Vice President Biden Announces New Administration Effort to Help Nation's Schools Address Sexual Violence (Apr. 4, 2011),* https://www.ed.gov/news/press-releases/vice-president-biden-announces-new-administrationeffort-help-nations-schools-ad.[2]

193.    The 2011 Dear Colleague Letter itself explicitly focused on protection of women, repeating the claim that "about 1 in 5 women are victims of completed or attempted sexual assault while in college" and stating that "the majority of campus sexual assaults occur when women are incapacitated, primarily by alcohol." *2011 Dear Colleague Letter* at 2 & n.3.

194.    The 2011 Dear Colleague Letter reaffirmed in principle that both accusers and accused have the right to have a prompt and equitable resolution, including the right to an adequate, reliable, and impartial investigation; similar and timely access to any information that will be used at the hearing; and adequately trained factfinders and decision makers. *Id.* at 9-11.

195.    The letter also, however, contained other provisions which expanded the nature and scope of schools' responsibility to address sexual misconduct, essentially compelling them to choose between fundamental fairness for students and continued federal funding. These provisions are not required by Title IX and are not consistent with legal precedent.

---

[2] *Supra* note 2.

196.    Among other things, the 2011 Dear Colleague Letter directed schools to ensure "steps taken to accord due process rights to the alleged perpetrator do not restrict or unnecessarily delay the Title IX protections for the complainant" (*id.* at 12); directed schools to take interim steps to protect complainants and "minimize the burden on the complainant" (*id.* at 15-16); "strongly discourage[d]" schools from allowing cross-examination of parties (*id.* at 12); and urged schools to focus on victim advocacy (*id.* at 19 n.46).

197.    The 2011 Dear Colleague Letter also stated that schools "must use a preponderance of the evidence standard (i.e., it is more likely than not that sexual harassment or violence occurred)," and must not use the "clear and convincing standard (i.e., it is highly probable or reasonably certain that the sexual harassment or violence occurred)." *Id.*

198.    Given the fact that campus disciplinary proceedings lack key procedural protections provided in court litigation (including discovery, the right to active representation by counsel, rules of evidence, and independent judges and juries to make decisions), the existence of other governmental and public pressure discussed in more detail below, and the severe and lasting consequences of a finding of responsibility for sexual misconduct, the preponderance standard does not adequately protect accused students' rights.

199.    Even though the 2011 Dear Colleague Letter purports to be a "guidance" document and did not go through rulemaking procedures, OCR framed many of its directives, including the directive to use the preponderance of the evidence standard, as mandatory.

200.    Moreover, the 2011 Dear Colleague Letter contained an explicit threat to colleges and universities: "When a recipient does not come into compliance voluntarily, OCR may initiate proceedings to withdraw Federal funding by the Department or refer the case to the U.S. Department of Justice for litigation." Id. at 16.

201.    The overriding purpose of the 2011 Dear Colleague Letter was "to make it easier for victims of sexual assault to make and prove their claims and for the schools to adopt punitive measures in response," and OCR "demand[ed] that universities do so or face a loss of federal funding." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 572 (D. Mass. 2016). As the *Brandeis* court observed, while "[t]he goal of reducing sexual assault, and providing appropriate discipline for offenders, is certainly laudable," the effect of the letter was "the elimination of basic procedural protections—and the substantially increased risk that innocent students will be punished." *Id.*

202.    The 2011 Dear Colleague Letter has been described as the "first warning shot" that OCR intended to punish any school that failed to handle sexual misconduct proceedings as OCR wanted.  *See How Sexual Assaults Came to Command New Attention*, NPR (Aug. 13, 2014), https://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention

203.    After the 2011 Dear Colleague Letter, the federal government continued to pressure colleges to deal aggressively with reported sexual misconduct, to adopt procedures that do not safeguard the rights of the accused, and to train officials to start with the presumption that an accused student is responsible, all with a focus on protection of women.

204.    In 2014, OCR released additional guidance in which it reiterated many of the directives set forth in the 2011 Dear Colleague Letter, including the directive to "ensure that steps to accord any due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant."  In addition, OCR advised schools to give employees and students "trauma-informed" training and said "hearings should be conducted in a manner that

does not inflict additional trauma on the complainant." Questions and Answers on Title IX and Sexual Violence, https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

205.    The same year, a White House Task Force was created, co-chaired by the Office of the Vice President and the White House Council on Women and Girls. The Task Force continued the government's focus on protection of women, with a mission "to tell sexual assault survivors that they are not alone" and "help schools live up to their obligation to protect students from sexual violence." *Not Alone: The First Report of the White House Task Force to Protect Students From Sexual Assault*, at 2, https://www.justice.gov/ovw/page/file/905942/download.

206.    The Task Force's first report opened with the claim that "[o]ne in five women is sexually assaulted in college," stated that the federal government was ramping up Title IX enforcement efforts, and stressed again that schools found in violation of Title IX risked losing federal funding. *Id*. at 2, 17.

207.    Among other things, the Task Force supported the use of a single investigator model, which generally involves one school official serving as investigator, prosecutor, and decision maker and severely limits the respondent's ability to challenge the complainant's account.  *Id*. at 3, 14.

208.    The Task Force also pressed colleges and universities to provide "trauma-informed" training for their officials, stating that "when survivors are treated with care and wisdom, they start trusting the system, and the strength of their accounts can better hold offenders accountable." *Id*. at 3.

209.    The report stated that the Justice Department, through its Center for Campus Public Safety and its Office on Violence Against Women, was developing trauma-informed training programs. *Id*.

210.    Ultimately, the Department of Justice funded a "Start by Believing" campaign under which investigators are trained to investigate cases from an initial presumption of guilt and write reports "that successfully support the prosecution of sexual assault cases." *End Violence Against Women International, Effective Report Writing: Using the Language of Non-Consensual Sex*, at 6, http://evaw.threegate.com/Library/DocumentLibraryHandler.ashx?id=43; *see also Campus Action Kit, Start by Believing*, https://www.startbybelieving.org/wpcontent/uploads/2019/08/Campus-Action-Kit.pdf.

211.    Among other things, "Start by Believing" training directs investigators to:

a.    "recreate the entire reality of the sexual assault <u>from the perspective of the victim</u>";

b.    focus on evidence and statements that "corroborate the victim's account";

c.    include details not just about what happened, but about "what the victim was thinking and feeling," in order to create a "word picture" that "better support[s] prosecution";

d.    "replace neutral words such as 'said,' 'told,' or 'asked'" with more "descriptive" words – e.g., say the "victim" "begged" or "pleaded," and the "suspect" was "ordering," "insisting," or "demanding";

e.    "describ[e] all of the elements that contributed to the victim's experience of force, threat, or fear";

f.    "always use the language of non-consensual sex"; i.e., instead of "terms that convey positive, mutual interactions such as 'sexual intercourse' [or] 'oral sex,'" "it is sometimes appropriate to use terminology from the penal code, such as 'rape' or 'sexual assault,'" or, alternatively "simply describe the parts

35

of the body and the things the victim was forced to do with those parts of the body";

g. "highlight implausible, absurd, and/or changing explanations provided by the suspect regarding what happened";

h. "try to anticipate potential defense strategies and include the evidence and information necessary to counter these strategies"; and

i. "ensure that . . . reports include all of the evidence required to prove the elements of the offense and refute the likely defense, which in most sexual assault cases is going to be consent."

*Effective Report Writing: Using the Language of Non-Consensual Sex*, at 5, 7, 8, 10, 11, 12, 14, 23, 30 (emphasis original).

212. In sum, "Start by Believing" training tells investigators: "By writing the report to recreate the reality of the sexual assault and refute potential defense strategies, investigators can greatly increase the likelihood that charges will be filed in the case, and it will result in a conviction. They may even help to make this process faster, smoother, and easier for the victim than it would otherwise be. As one experienced prosecutor summarized, 'a well-written report can make a jury trial into a bench trial and a bench trial into a guilty plea.'" *Effective Report Writing: Using the Language of Non-Consensual Sex*, at 37.

213. The online postings, messaging, and programming offered by OU encourages the belief that individuals should "start by believing."

214. In February 2014, Catherine E. Lhamon, then the Assistant Secretary of Education and head of OCR, told college officials attending a conference that existing practices for handling sexual misconduct complaints send a message "that victimized students are worth

36

less than the people who assault them"; that school officials and she as "chief enforcer" needed to "radically change that message"; and that "if you don't want to do it together, I will do it to you." *Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases*, Chronicle of Higher Education (Feb. 11, 2014), https://www.chronicle.com/article/Colleges-Are-Remindedof/144703.

215.    According to the Chronicle of Higher Education, college officials understood they had been given "crisp marching orders from Washington" to follow OCR's directives. *Id.*

216.    On May 1, 2014, as part of its aggressive enforcement policies following the 2011 Dear Colleague Letter, OCR published a list of 55 higher education institutions nationwide that were then under investigation for possible Title IX violations. *U.S. Department of Education Releases List of Higher Education Institutions with Open Title IX Sexual Violence Investigations* (May 1, 2014), https://www.ed.gov/news/press-releases/us-department-education-releases-listhigher-education-institutions-open-title-ix-sexual-violence-investigations.

217.    According to the Chronicle of Higher Education, that number eventually grew to over 500. *Title IX, Tracking Sexual Assault Allegations,* Chronicle of Higher Education, https://projects.chronicle.com/titleix/.

218.    The sharp increase in the number of investigations – the overwhelming majority of which have involved alleged violations of the rights of complaining students, almost always female – was accompanied by increases in the scope of OCR's investigations, in findings that schools had violated Title IX, and in the imposition of punitive measures as a result.

**B. In response to government and public pressure, colleges and universities across the nation have adopted Title IX policies and procedures that are "victim"-centered and fundamentally unfair to accused individuals.**

219.    The threats and pressure from OCR have forced colleges and universities to change their policies, since virtually all colleges and universities in the country receive federal funding.

220.    In response to the federal government's directives and enforcement activities, schools across the nation have adopted special policies for disciplinary proceedings involving alleged sexual misconduct. The policies are administered by designated officials and include investigatory and decision-making processes, evidentiary standards, and appeal processes based on OCR's actual and perceived requirements. In many instances, the policies and processes offer accused students significantly less protections than students receive in other campus disciplinary matters, including matters involving allegations of serious non-sexual misconduct.

221.    In their policies for adjudicating Title IX complaints, many schools have gone even further than OCR's specific directives in adopting procedures favoring alleged victims (the great majority of whom are female) and essentially eliminating fair process protections for respondents (the great majority of whom are male).

222.    Following the model of the federally-funded "Start by Believing" campaign, schools routinely train their officials to apply trauma-informed and "#BelieveWomen" approaches in ways that lead them to presume that an alleged assault occurred, that a complainant's account of an incident must be true, and that a complainant's subjective impressions determine whether conduct is sexual harassment or assault. Students are suspended or expelled without meaningful notice or opportunity to be heard and are left with records that permanently brand them as sexual offenders, devastate them personally, and severely impact their educational and career opportunities.

223. The same kinds of training and guidance go to other members of the college community, and in this age of social media and the internet, the mere mention of a sexual misconduct accusation can have the same negative and ongoing effects as a finding of responsibility, even if the accused is exonerated.

224. "Because the changes to the process were impelled in large part by the federal government, the issues presented [in any particular case] are not entirely unique and not confined to a single campus." *Brandeis*, 177 F. Supp. 3d at 572.

225. Numerous groups and organizations have spoken out against the legal and financial pressure exerted by OCR to force colleges and universities to find students accused of sexual misconduct (who are overwhelmingly male) responsible, in spite of the evidence or the lack of evidence. (*See, e.g.*, Foundation for Individual Freedom in Higher Education (FIRE), Stop Abusive and Violent Environments (SAVE), Families Advocating for Campus Equality (FACE), and prominent Harvard and University of Pennsylvania Law School faculty members asserting that OCR's new rules violate the due process rights of the accused.)

226. In the words of a judge considering college disciplinary procedures that "appear[] to have substantially impaired, if not eliminated, an accused student's right to a fair and impartial process:" "it is not enough simply to say that such changes are appropriate because victims of sexual assault have not always achieved justice in the past. Whether someone is a 'victim' is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning. Each case must be decided on its own merits, according to its own facts. If a college student is to be marked for life as a sexual predator, it is reasonable to require that he be provided a fair opportunity to defend himself and an impartial arbiter to make that decision. Put simply, a fair determination of the facts requires a fair process, not tilted to favor a particular outcome, and

a fair and neutral factfinder, not predisposed to reach a particular conclusion." *Brandeis*, 177 F. Supp. 3d at 573.

227.    Other federal and state courts, as well as some state legislators and university officials, have similarly expressed concerns that efforts to redress longstanding social problems are resulting in unfair processes and results in individual Title IX proceedings.

228.    On September 3, 2014, NPR published an article titled, "Some Accused Of Sexual Assault On Campus Say System Works Against Them." Here, the University of Maine's Dean Robert Dana recognized that federal pressure made universities rush to judgment on individual allegations, stating, "I expect that that can't help but be true. Colleges and universities are getting very jittery about it." https://www.npr.org/2014/09/03/345312997/some-accused-of-campus-assault-say-the-system-works-against-them#:~:text=this%20one!'-,%22,getting%20very%20jittery%20about%20it.%22

229.    In reminiscing about the pressure applied to colleges and universities under the Obama administration, former Office of Civil Rights lawyer Jackie Gharapour admitted, "We did see some bad cases in the Obama era, cases where it basically didn't matter what evidence there was. The college was going to find against the defendant, the male defendant, no matter what. I think the schools felt pressure under the Obama guidance." https://www.realclearinvestigations.com/articles/2020/12/15/bidens_pushing_ahead_to_the_obama_past_on_campus_rape_hell_need_good_luck_with_that_126353.html?fbclid=IwAR229kxedzNe_pkf7AiQOAmv1XX8O3SMPPs93RFq1wDodqLnudEIqRUc2ow

230.    Similarly, Association of Title IX Administrators ("ATIXA") president, Brett Sokolow recalled that, "the problem of biased outcomes was real. Educational institutions

railroaded those accused of sexual violence and harassment (mostly cisgender men) in numbers

that should terrify any reasonable person."

https://www.insidehighered.com/views/2022/07/12/flexibility-title-ix-regs-blessing-and-curse-

opinion

### C. Starting in 2017, the Department of Education has modified its approach to Title IX enforcement, focusing on fairness to all parties.

231.    In guidance documents issued on September 22, 2017, the Department of Education

expressed concern that many schools have established procedures for resolving allegations that

"'lack the most basic elements of fairness and due process, are overwhelmingly stacked against

the accused, and are in no way required by Title IX law or regulation.'" Dear Colleague Letter

(Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

A Q&A on Campus Sexual Misconduct, which the Department adopted the same day, provided

guidance on procedural protections necessary for a fair, reliable process. 2017 Q&A,

https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

232.    On November 29, 2018, the Department published new proposed regulations for

public review and comment. *Nondiscrimination on the Basis of Sex in Education Programs or*

*Activities          Receiving          Federal          Financial          Assistance*,

https://www.federalregister.gov/documents/2018/11/29/2018-25514/nondiscrimination-on-the-

basis-of-sex-in-education-programs-or-activities-receiving-federal.

233.    The proposed regulations represented the Department's effort to align Title IX

regulatory requirements with basic principles of justice and court rulings requiring that people

accused of serious misconduct receive notice, a fair hearing before unbiased decision makers,

and a presumption of innocence. *Id*.

234.    The proposed regulations set forth specific procedural protections including:

41

a.  Provisions requiring schools to provide adequate notice of allegations and their applicable procedures, conduct full and fair investigations, collect, and objectively evaluate both exculpatory and inculpatory evidence, create investigative reports that fairly summarize relevant evidence, provide fair hearings in front of unbiased decisionmakers (who cannot be the same people as the investigator(s)), and give respondents a presumption of non-responsibility.

b.  Provisions requiring schools to allow both parties to review all the evidence related to the allegations (not just evidence the school considers relevant or intends to rely on), so that the parties can meaningfully respond to the evidence before the investigation concludes.

c.  Provisions requiring schools to train officials to conduct impartial proceedings, not to rely on sex stereotypes, and not to base credibility decisions on a party's status as complainant or respondent.

d.  Provisions requiring colleges and universities to provide a live hearing and allow advisors to the parties to cross-examine the other party and witnesses.

235.    The proposed regulations confirmed that "[a school's] treatment of a complainant in response to a formal complaint of sexual harassment may constitute discrimination on the basis of sex under title IX" and that "[a school's] treatment of the respondent may also constitute discrimination on the basis of sex under title IX." Proposed 34 C.F.R. § 106.45.

236.    On May 7, 2020, the Department of Education announced the final Title IX regulations. *Nondiscrimination on the Basis of Sex in Education Programs or Activities*

42

*Receiving Federal Financial Assistance* (to be published in the Federal Register; unofficial text available at https://www2.ed.gov/about/offices/list/ocr/docs/titleix-regs-unofficial.pdf).

237.    Under the final regulations: "A recipient's response must treat complainants and respondents equitably by offering supportive measures as defined in § 106.30 to a complainant, and by following a grievance process that complies with § 106.45 before the imposition of any disciplinary sanctions or other actions that are not supportive measures as defined in § 106.30, against a respondent." 34 C.F.R. § 106.44(a), as amended.

238.    Section 106.45(b) sets forth the specific requirements for a formal grievance process.

239.    The Department repeatedly emphasized that the protections it mandated are rooted in longstanding principles of due process and fundamental fairness and apply to both private and public institutions. "[A]s the Department has recognized in guidance for nearly 20 years, Title IX rights must be interpreted consistent with due process guarantees." *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, Supplementary Information, at 276.

240.    Section 106.45(a) confirms that a school's "treatment of a complainant or a respondent in response to a formal complaint of sexual harassment may constitute discrimination on the basis of sex under title IX."

241.    As the Department explained: "In every case in which Title IX sexual harassment is alleged, the facts must be resolved accurately to further the non-discrimination mandate of Title IX, including providing remedies to victims and ensuring that no party is treated differently based on sex. . . . The [regulatory] grievance process aims to provide both parties with equal rights and opportunities to participate in the process, and to promote impartiality without favor

to complainants or respondents, both because treating a complainant or respondent differently based on sex would violate Title IX, and because a process lacking principles of due process risks bias that in the context of sexual harassment allegations is likely to involve bias based on stereotypes and generalizations on the basis of sex." Supplementary Information, at 220, 277.

**D. Ohio University's Response to the Proposed 2020 Regulations.**

242.    On January 30, 2019, the University submitted comments on the Notice of Proposed Rulemaking outlining changes to the regulations under Title IX.

243.    Through these comments, the University made its goal of protecting survivors, discriminating against males, and stripping the accused of due process rights well known.

244.    In its comments, OU discouraged the use of cross-examination by an advisor.

245.    Instead, OU requested that only the hearing panel be permitted to ask questions of the parties. This is the same approach Defendant Anaya took when he refused to allow reasonable cross-examination by Plaintiff's advisor.

246.    These 2020 Regulations went into effect in August, 2020.

247.    At the time of Plaintiff's investigation and adjudication, OU was bound by the 2020 Regulations and relevant laws.

**E. Pressure applied to OU directly.**

248.    In addition to the pressure that has been applied to colleges and universities generally since the 2011 Dear Colleague Letter, OU has been subjected to specific pressure and criticism regarding its handling of sexual assault, and in particular, pressed to do more to protect female "survivors" and punish male "perpetrators."

249.    On September 25, 2018, an article was published with the Cincinnati Enquirer and USA Today, titled, "Four weeks. 12 reports of sexual assault. And Ohio University students

are 'fed up'" https://www.usatoday.com/story/news/nation-now/2018/09/26/ohio-university-sexual-assault-rape-culture-campus/1424931002/

250. The publication discusses the large number of sexual assault reports on OU's campus and demands that action be taken to curtail these reports and crimes.

251. In response to this article and the pressure from students, then President of OU, Duane Nellis, stated, "we will work tirelessly to hold those who commit such crimes fully accountable under the law and on campus." *Id.*

252. In October, 2018, OU launched its "Start by believing" campaign, discussed herein.

253. The "Start by believing" campaign was started in response to a sexual assault suffered by a then-student at OU, Brie Sivy.

254. The "Start by believing" campaign at OU features a 30-minute-long documentary, staring Sivy and discussing her case and the way her investigation was handled. The documentation is a celebration of how that investigation was handled.

255. The documentary discusses the importance of "survivor-centered investigations."

256. The documentary begins with Sivy misremembering where she was sitting for her police interview. When the other two individuals correct her, Sivy laughs and replies, "man, I really did block out a lot of that."

257. This is an example of "survivor-centered" investigations, where any lack of memory from an accuser is forgiven and attributed to trauma.

258. "Survivor-centered" investigations are designed to forgive an accuser's inconsistent statements, as well as any behavior after the alleged trauma, such as sleeping the rest of the night with the man who was alleged to violently attacked the accuser.

45

259. By their very nature, "survivor-centered" investigations are not designed to be impartial and reliable. They are designed to support alleged survivors.

260. Outcomes in favor of the accused do not support alleged survivors and are not "survivor centered."

261. In the documentary, it is explained that a "survivor-centered" investigation means that the accuser or "alleged survivor" makes the calls in the investigation.

262. The documentary concludes with an alleged statistic that "out of 1,000 sexual assaults: 5 are convicted."

263. Start by believing and "survivor-centered" investigations are the antithesis of starting with the presumption that Plaintiff is not responsible.

264. Despite this, Ohio University holds multiple "start by believing" events and hosts the "start by believing" documentary on their YouTube page and website. https://www.ohio.edu/survivor/get-involved/start-believing

265. The "start by believing" attitude and the importance of a "survivor-centered" investigation was used by Defendants against Plaintiff.

**F. Pro-"victim/survivor" bias violates Title IX.**

266. Since cases involving alleged sexual misconduct on college campuses overwhelmingly arise from a woman accusing a man, measures that are put in place to protect alleged victims and punish alleged perpetrators necessarily result in harsher treatment of men.

267. Indeed, as noted above, efforts to provide more protections to reported victims of sexual misconduct have consistently focused on protection of women.

268. As the 2020 Title IX regulations confirm, any approach under which accused people are presumed guilty or deprived of the ability to defend themselves, or individual cases

46

are resolved without full and fair consideration of the facts of each case, is contrary to this nation's fundamental principles and contrary to Title IX and the Clery Act's requirements of a "prompt, fair, and impartial investigation and resolution." 20 U.S.C. § 1092(f)(8)(B)(iv)(I)(aa); *see also* 34 C.F.R. 106.8(b) and 45 C.F.R. § 86.8(b) (quoted above).

269.    In the words of Justice Ruth Bader Ginsburg, fair process for the accused "must not be ignored and it goes beyond sexual harassment. The person who is accused has a right to defend herself or himself, and we certainly should not lose sight of that. Recognizing that these are complaints that should be heard. There's been criticism of some college codes of conduct for not giving the accused person a fair opportunity to be heard, and that's one of the basic tenets of our system, as you know, everyone deserves a fair hearing." Asked how to "balance the values of due process against the need for increased gender equality," Justice Ginsburg replied: "It's not one or the other. It's both. We have a system of justice where people who are accused get due process, so it's just applying to this field what we have applied generally." Jeffrey Rosen, *Ruth Bader Ginsburg Opens Up About #MeToo, Voting Rights, and Millennials*, The Atlantic (Feb. 15, 2018), https://www.theatlantic.com/politics/archive/2018/02/ruth-bader-ginsburg-opens-upabout-metoo-voting-rights-and-millenials/553409/.

270.    That measures to protect reported victims are generally equated with protection of women, and measures to ensure a fair process for respondents are generally equated with protection of men, has been starkly confirmed by responses to the Department of Education's 2017 guidance and its proposal in 2018 to amend Title IX regulations to ensure a fair process for both complainants and respondents.

271.    Over 100,000 comments were filed to the proposed 2020 regulations, with a common theme being allegations that the Department's efforts to restore fair processes in campus

47

disciplinary proceedings were motivated by bias against women and disproportionately burden women.

272.    To avoid sex discrimination, campus disciplinary proceedings should be fundamentally fair to all participants: complainants and respondents, regardless of sex.

**G. Both on their face and as applied, Ohio University's policies and procedures violate Title IX.**

273.    Both on their face and as applied in this case, OU's policies and procedures for handling allegations of sexual misconduct violated Title IX. OU reached an erroneous outcome, selectively enforced its disciplinary procedures, applied archaic assumptions, and acted with deliberate indifference to Ms. Roe's misconduct against Plaintiff, all based on Plaintiff's gender. Among other things, as set forth above, OU:

a.  Reached a result-driven determination rather than reaching a decision based on a preponderance of all relevant evidence;

b.  Made credibility determinations against Plaintiff and in favor of Ms. Roe that were not rationally based on the evidence or logic;

c.  Failed to question Ms. Roe's credibility in light of demonstrably false statements and willful attempts to manipulate the process in her favor and tamper with witnesses;

d.  Failed to follow its own policies and procedures;

e.  Stripped Plaintiff of his right to effectively cross-examine Ms. Roe;

f.  Willfully ignored Ms. Roe's behavior after the alleged assault, including sleeping in the same bed as Plaintiff;

g.  Ignored exculpatory evidence;

48

    h.   Made improper and speculative inferences and shifted the burden of proof onto Plaintiff as a way to find him not credible and therefore responsible;

    i.   Ignored the credibility concerns of all other witnesses, including their eagerness to be a pawn in Ms. Roe's gamesmanship;

    j.   Treated Plaintiff and Ms. Roe significantly different in allowing Ms. Roe to introduce improper victim-impact evidence during the hearing, as well as evidence that was never disclosed during the investigation, while prohibiting Plaintiff from doing the same; and

    k.   Failing to train its officials to handle sexual misconduct allegations fairly and impartially.

274.    OU fosters a campus community that encourages students, staff, and officials to "Start by Believing" and promotes the belief that only females are victims of sexual misconduct and only males are perpetrators of sexual misconduct.

275.    OU's process is not intended to treat complainants and respondents equally, or to fairly investigate and adjudicate complaints. Rather, the process is designed to respond in a manner designed to eliminate the misconduct by arbitrarily finding male respondents, like Plaintiff, responsible for violations and removing them from campus.

276.    OU's discriminatory and one-sided process deprived Plaintiff, as a male student, of educational opportunities on the basis of sex.

277.    Plaintiff's case is part of a pattern and practice of Title IX violations and discrimination against male students accused of sexual misconduct.

278.    Information concerning sexual misconduct complaints at OU and the outcome of disciplinary proceedings involving male students compared to female students is in OU's

exclusive possession and control. Upon information and belief, statistics within OU's exclusive possession and control will show a pattern of intentional discriminatory conduct, erroneous outcomes, archaic assumptions, and selective enforcement based on gender.

279.    Upon information and belief, statistics within University's exclusive possession and control will show that students accused of sexual misconduct are overwhelmingly male, and that male students accused of sexual misconduct are overwhelmingly found responsible.

280.    As a direct, proximate, and foreseeable consequence of Defendant's violations of Title IX, Plaintiff sustained significant damages, including, but not limited to, damages to reputation, loss of educational opportunities, loss of career opportunities, loss of future career prospects, economic injuries, and other direct and consequential damages.

281.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT II

**Violation of the Due Process Clause of the 14th Amendment to the United States Constitution, Pursuant to 42 U.S.C. §§ 1983, 1985, 1988 (Against the Individual Defendants, in their Individual Capacities)**

282.    Plaintiff repeats and realleges each and every allegation set forth above as if fully rewritten herein.

283.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property without due process of law."

284.    A person has a protected liberty interest in pursuing his education as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

285.    Plaintiff's constitutionally protected property interest in his degree, which he relies upon for his employment, are to be free from arbitrary dismissal arising from the policies, courses of conduct, practices, and process set forth by OU.

286.    Plaintiff's constitutionally protected property interest in his degree and his employment arise from the express and implied contractual relationship between OU and Plaintiff.

287.    The Fourteenth Amendment due process protections are required in the higher education disciplinary proceedings such as at OU.

288.    Thus, a person who has been admitted to a public university, and has paid tuition to that university, has a protected property interest in the degree earned through coursework and the payment of tuition. The State cannot deprive a person of this interest without due process.

289.    As a result, Plaintiff, who was subjected to disciplinary action that included the possibility of suspension or dismissal, if found responsible, is entitled to the due process protections of the Fourteenth Amendment to the United States Constitution.

290.    At all times, Plaintiff was also entitled to federal rights under Title IX. These rights are contained throughout this Complaint.

291.    At all times relevant, each Defendant knew of Plaintiff's federal rights under Title IX.

292.    Defendant OU, as a public university, has an absolute duty to provide its students with equal protection and due process of law by and through any and all policies and procedures set forth by the University.

293.    Plaintiff had been maintaining satisfactory academic marks, abided by his financial obligations to the University and had obeyed the University's policies when he was dismissed from the University. He was set to graduate months after his dismissal.

294.    Under both federal and state law, Plaintiff had a constitutionally protected interest in his good name, reputation, and future employment.

295.    Under both federal and state law, Plaintiff had a constitutionally protected property interest in his degree.

296.    Plaintiff was entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. The allegations in this matter resulted in a sanction that will have lifelong ramifications for Plaintiff, including loss of future wages, loss of NIL endorsements, and loss of future education opportunities.

297.    Plaintiff was entitled to fundamentally fair procedures to determine whether he was responsible for the alleged sexual misconduct involving Ms. Roe.

298.    In the course of its investigation process, Defendants knowingly, flagrantly, willfully, and maliciously violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment and Title IX through the Defendants' repeated acts of deprivation of the minimal requirements of procedural fairness.

299.    Defendants deprived Plaintiff of his liberty and property interests without affording him basic due process, including but not limited to, his right to a fair and impartial adjudication, and to a meaningful opportunity to be heard by those making the decision on credibility, and ultimately, responsibility. Rather than provide a fundamentally fair process,

Defendants conducted a result driven process aimed at finding men responsible of sexual misconduct.

300.     Rather than provide a fair and impartial adjudication, OU employed a sham process.

301.     Based on the general bias expressed throughout the University and implicit in its policies and procedures, Defendants subjected Plaintiff to an insufficient process when it failed to provide Plaintiff with a fair and reasonable opportunity to defend himself and arrived at a predetermined, arbitrary, and unwarranted decision.

302.     As a result, Defendants failed to provide Plaintiff with the basic due process protections that Defendants are required to provide students accused of sexual misconduct and faced with a possible sanction of dismissal.

303.     Defendants were acting under the color of the law when they showed intentional, outrageous, willful, and reckless disregard for Plaintiff's constitutional rights.

304.     OU, as well as its agents, representatives, and employees agreed to, approved, and ratified this unconstitutional conduct.

305.     As a result of these due process violations, Plaintiff continued to suffer ongoing harm, including damage to his reputation, loss of his degree, eventual loss of employment, and other non-economic and economic damages.

306.     As a direct and proximate cause of Defendants' actions, Plaintiff suffered tremendous damage to his person and reputation, including without limitation, emotional distress, loss of future employment, and loss of educational opportunities, economic damages, and other direct and consequential damages.

307.     Plaintiff is entitled to injunctive relief as a result of the deprivation of his due process and equal protection rights. Preliminary injunction should return the status quo before the controversy at issue, with Plaintiff being a student in good standing.

308.     Further, injunctive relief to provide Plaintiff with a fair and equitable student disciplinary process conforming with his due process and equal protection rights is proper. Plaintiff is entitled to have a hearing affording him his rights under the law. In contrast, the University can have no legitimate interest in failing to provide a fair, equitable, and impartial hearing, conforming to the law and the rights that are afforded to persons under the law.

## COUNT III

### Breach of Contract
### (Against OU)

309.     Plaintiff repeats and realleges each and every allegation set forth above as if fully rewritten herein.

310.     At all relevant times, a contractual relationship existed between Plaintiff and OU.

311.     The promises contained in OU's Policies and Procedures are legally binding obligations.

312.     Defendant was required to act in accordance with the University's written policies and procedures in investigating and adjudicating reports of alleged policy violations.

313.     Based on the facts and circumstances set forth in this Complaint, Defendant materially breached its express and/or implied agreements with Plaintiff by failing to comply with its obligations, standards, policies, and procedures in the course of the disciplinary proceedings against Plaintiff, and by subjecting him to fundamentally unfair processes.

314.     In its Policy and Procedures, OU promises, among other things, that it will:

    a.   Give Plaintiff a meaningful opportunity to be heard, including the right of a meaningful cross-examination of all other parties and witnesses;

    b.   Objectively evaluate evidence;

    c.   Avoid making disciplinary decisions, including credibility determinations, based on a person's status as a complainant, respondent, or membership in a protected class, such as gender;

    d.   Treat Plaintiff and Ms. Roe equally;

    e.   Allow Plaintiff to review and respond to all evidence and witness statements collected;

    f.   Prohibit irrelevant evidence from being considered, including victim-impact evidence during the hearing;

    g.   Appoint panel members who are free from conflicts of interest or bias;

    h.   Prohibit parties from intentionally tampering with the hearing process and witnesses; and

    i.   Correct any errors in the investigation and/or adjudication process through an appeal.

315.   Defendant materially breached its obligations when, among other things, it:

    a.   Ignored Ms. Roe's credibility issues, including her willful manipulation of the process, tampering with witnesses, her strange behavior after the alleged assault, her omission of evidence, and her demonstrable false statements;

    b.   Ignored the credibility issues of the other witnesses, including their communications with Ms. Roe during their respective testimony;

    c.   Shifted the burden of proof onto Plaintiff to prove his innocence, as well as a motive for Ms. Roe to fabricate her claims;

    d.   Stripped Plaintiff of his ability to have his advisor effectively cross-examine Ms. Roe;

    e.   Treated Plaintiff and Ms. Roe differently, particularly in allowing Ms. Roe to introduce new evidence at the hearing, while denying Plaintiff the same opportunity, as well as allowing Ms. Roe to control the entire hearing process through her gamesmanship;

    f.   Allowed Ms. Roe and other witnesses to provide victim-impact evidence, all of which sought to prejudice Plaintiff and earn sympathy for Ms. Roe;

    g.   Ignored exculpatory evidence;

    h.   Engaged in several material procedural irregularities, all of which benefited Ms. Roe; and

    i.   Erroneously concluded that Plaintiff was responsible for the alleged policy violations.

316.   Defendants materially breached its Policy when it failed to correct the material procedural errors and clearly erroneous outcome on appeal.

317.   Plaintiff fully complied with his contractual obligations to OU.

318.   As a direct, proximate, and foreseeable consequence of Defendants' breach of its express and/or implied contractual obligations, Plaintiff sustained significant damages, including, without limitation, damage to reputation, loss of educational opportunities, loss of career opportunities, loss of future career prospects, economic injuries, and other direct and consequential damages.

319.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, John Doe respectfully requests that this Honorable Court:

(a)    Order OU to reverse and expunge its findings of responsibility and sanction of expulsion from Plaintiff's education record;

(b)    Order OU to provide a Dean's Certification that shall be made available to third parties (such as educational institutions and prospective employers) certifying that it has reversed and expunged the findings and sanction;

(c)    Award Plaintiff compensatory and punitive damages in an amount to be determined at trial, including, without limitation, damage to reputation, loss of educational opportunities, loss of career opportunities, loss of future career prospects, economic injuries, and other direct and consequential damages;

(d)    Award prejudgment interest;

(e)    Award attorneys' fees and costs pursuant to statutory or common law doctrines providing for such award;

(f)    Declare that: (i) the outcome and findings made by Defendant relating to the allegations set forth by Jane Roe should be reversed; (ii) Plaintiff's reputation be restored; (iii) Plaintiff's disciplinary record be expunged and sealed; (iv) any record of Plaintiff's dismissal from the University be removed from his educational file; (v) any record of Jane Roe's complaint against Plaintiff be permanently destroyed; (vi) Plaintiff be reinstated to the University as a student in good academic standing; (vii) University's rules, regulations and

guidelines relating to the adjudication of allegations of sexual misconduct are

unconstitutional as applied; and

(g)     Grant such other and further relief that the Court deems just and proper.


Respectfully Submitted,

*/s/ Tyler J. Walchanowicz*
ERIC F. LONG
TYLER J. WALCHANOWICZ
Counsel for Plaintiff
Friedman, Nemecek Long & Grant, L.L.C.
1360 East 9th Street, Suite 650
Cleveland, OH 44114
P: (216) 928-7700
F: (216) 820-4659
E: efl@fanlegal.com
E: tjw@fanlegal.com